## HOLMES *v.* STATE.

(In Banc. Dec. 10, 1945.)

[24 So. (2d) 90. No. 35993.]

C. A. Bratton, of Oxford, and S. C. Mims and Cowles Horton, both of Grenada, for appellant.

Greek L. Rice, Attorney General, by R. O. Arrington, Assistant Attorney General, J. P. Coleman, of Ackerman, and W. I. Stone, of Coffeeville, for appellee.

Argued orally by **Cowles Horton** and **C. A. Bratton**, for appellant, and by **J. P. Coleman**, for appellee.

**Roberds, J.,** delivered the opinion of the Court.

Appellant was indicted for, and convicted of, the murder of Shed Ashmore, and sentenced to the state penitentiary for life, the jury disagreeing as to the punishment.

On this appeal Holmes contends (1) that the evidence is insufficient to show him guilty of any crime whatso-

ever and that, therefore, his request for a peremptory in-
struction should have been granted by the lower court,
but, if mistaken in this, (2) that he cannot be convicted
under the proof of a greater crime than manslaughter;
that (3) the trial court erred in granting to the state, and
(4) refusing to grant to the defendant, certain instruc-
tions hereinafter more specifically set out.

A decision of one will necessarily dispose of both of
the first two contentions. Bitter feeling existed between
Holmes and Ashmore. Each had made serious threats
against the other, but the other did not know of such
threats. There is evidence that Ashmore's general repu-
tation for peace and violence was bad, and that Holmes
knew that. Holmes shot Ashmore at a gasoline filling
station in Grenada, Mississippi, on the morning of March
1, 1945, which was Thursday, and Ashmore died from
the shots on Saturday thereafter. This station before
that time had been leased to, and operated by, a brother
of Holmes, who had lost it for failure to pay the rent, and
the owner had leased it to Ashmore, who took charge and
and began to operate it the day he was shot. A Mrs.
Bunch operated a cafe in the same building, and which
adjoined on the south the office and supply room of the
gas station. Mrs. Bunch and Holmes protested vigor-
ously, without success, to the owner of the gas station the
leasing thereof to Ashmore. Holmes married Mrs. Bunch
shortly after this tragedy. The gas station faced west on
highway 51. In front of the office, and between it and
the highway, two gasoline pumps were located, leaving
a space of some 15 to 20 feet between the office and the
pumps.

The drama on the fatal morning, as given in the testi-
mony of Holmes himself, was this: He went to the cafe
in his automobile, and there parked it; and he and Mrs.
Bunch drove into and returned from Grenada in her car,
which she then parked near the cafe. At this point Ash-
more came out of the office, and thinking, or pretending to
think, the cars as parked would interfere with persons
desiring to drive to and from his gas pumps, told Mrs.

Bunch she would have to move her car. Mrs. Bunch refused, saying the car was on her premises, and she then went toward her cafe; whereupon, as Holmes got into his car, Ashmore demanded that he move the car, using vile language towards Holmes, saying, ". . . when I get this gun you will move it or I will kill you," and "he started to the door of the filling station . . . " and when he was reaching in the door ". . . I didn't know whether he was catching to pull up or what . . . but when he did I shot him"; Holmes, at the time, also uttering vile language directed to Ashmore.

Holmes also testified that before he shot he had gotten into his automobile, and that he procured his pistol from the car pocket; that when the above conversation took place, and when he began to shoot, that Ashmore was some eight to ten steps from him, and that Ashmore had no weapon of any kind in his possession, and made no hostile demonstration whatever toward him; that Ashmore, when Holmes began to shoot, was retreating toward, and went into, his office; that he, Holmes, got out of his automobile and followed Ashmore to the office, and there continued to shoot him, or at him. Holmes had a thirty-two Smith and Wesson automatic pistol, and he shot six times in all, emptying his pistol. He says he shot Ashmore because he thought Ashmore was going to get a gun from his office and shoot him. Ashmore was hit three times. All entered the right side of his body. The first and fatal shot entered the ilium, went through the pelvic cavity and out the left side of the body; another entered from four inches below the first and went through the body; the third entered the inside of the right thigh and remained in the body. Four bullets from the pistol were found in the office, showing that at least four shots were fired therein, and at least one of these shots hit Ashmore.

One, Mullen, apparently the only eyewitness other than Holmes, testified that he was in front of the station and saw what happened; that he heard Ashmore tell Holmes to move the car, and that Holmes replied that he

was upon his own premises, and that Ashmore said, with an oath directed at Holmes, ". . . when I get my gun you will move them," and that ". . . Ashmore walked back to his station door . . . "; and that Holmes, using vile language toward Ashmore, began to shoot him, and that at the first shot Ashmore "grabbed his (right) side that way . . . " He also testified that Ashmore had no weapon in his possession.

After the shooting Holmes telephoned the city police he had shot a man, and to come to the Star Cafe. Policeman Tatum shortly arrived. He found Ashmore in agony on the floor in the office and supply room, with no weapon in his possession. Ashmore was carried to the hospital, where, as stated, he died on the following Saturday. Tatum found the four pistol bullets in this office. One of them had struck the floor, indicating that this shot was fired after Ashmore had fallen. Tatum also found in his office a twenty-two gauge rifle, and another witness testified that Ashmore had told him that this might be the rifle that would kill Holmes. However, that was not communicated to Holmes. It is thus seen that appellant shot Ashmore with a deadly weapon at a time when Ashmore was from 24 to 30 feet from him, possessed of no weapon at the time, and while Ashmore was retreating from him, and that appellant got out of his automobile and followed Ashmore to his office, a distance of at least 30 feet, and there continued to shoot him, or at him, while Ashmore yet had no weapon and was helpless, and after he had been mortally wounded, all because, as Holmes said, he thought Ashmore might procure in his office some weapon the nature and existence of which he knew not, and attack him. Holmes said he shot Ashmore in self-defense—not in the heat of passion. The jury was amply justified in finding him guilty of murder. It follows that the first two contentions are not well taken.

We will now discuss the instructions given the state, of which appellant complains. Several of these were given on the assumption that the jury could convict appellant under the evidence in this case. Appellant says this was

error, because the evidence does not permit of conviction of any crime. What we have said above adversely disposes of this contention. We might add, in this connection, that the state procured and submitted to the jury a manslaughter instruction, which the jury rejected.

Appellant complains of this instruction given the state: "The Court instructs the jury that in order to justify a homicide on the plea of self-defense there must be something shown in the conduct of the deceased indicating a present intention to kill, or to do some great personal injury to the slayer, and immediate danger of such intention being accomplished; and mere fears or belief are insufficient. The danger must be such as to lead a person reasonably to believe that the killing was necessary to prevent the deceased from killing him, or doing him some great bodily harm." It is first said that the word "apparent" should have preceded the word "danger" in that instruction. That is technically correct; but the rest of the instruction clearly informed the jury this danger might be actual or apparent; as, for instance, "The danger must be such as to lead a person reasonably to believe that the killing was necessary . . . " In addition to this, appellant obtained an instruction which told the jurors it was their duty to place themselves in the position of Holmes, "when he shot the deceased and throughout your consideration of this case to judge the defendant from his viewpoint and as things then appeared to him." It is a frequent announcement of the Court that all the instructions are to be read and considered together.

Further objection is made to this instruction because it used the word "immediate" instead of "imminent" preceding and modifying the word danger. Since the word imminent is used in section 2218 (f), Code 1942, it is preferable that it be used rather than the word immediate, yet the word immediate was used in an instruction given in the case of Williams v. State (Miss.), 14 So. (2d) 216, and not disapproved by this Court; and the case of Fortenberry v. State, 55 Miss. 403, cited by learned counsel, is not to the contrary under the facts of that case.

Webster's New International Dictionary, Unabridged, (2d Ed.), gives as one meaning of imminent, ". . . . threatening to occur immediately; near at hand; impending"; and of immediate, "next in line or relation; directly connected, succeeding, or the like. The immediate future; occurrng without delay." We do not think the jury could have been misled by the use of the word immediate, and, as stated, other instructions were given appellant clearly setting out his rights in this respect.

Appellant requested seven instructions which were refused. One was a peremptory; some bore on the weight of the evidence. We have carefully examined all of them. We think there was no error in their refusal; but, if so, such error was cured by the instructions granted appellant. He obtained twelve instructions, submitting to the jury every right to which he could have been entitled under the evidence of this case.

The fact is, counsel on both sides, displayed unusual skill and ability, and the trial judge commendable care and fairness, in the trial of this case. Appellant had a fair trial at the hands of a jury of his county, and they found him guilty. There is nothing in this record which would justify us in setting aside that verdict.

Affirmed.